UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

| | | |
|---|---|---|
| BILLIARDS AND BREWS, LLC, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 3:23-cv-181 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| CITY OF KNOXVILLE, TENNESSEE, | ) | Magistrate Judge Debra C. Poplin |
| | ) | |
| *Defendant*. | ) | |

# **M E M O R A N D U M**

Before the Court is a motion for summary judgment by Defendant City of Knoxville, Tennessee (the "City"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 156.) Plaintiffs, Billiards and Brews, LLC ("B&B") and Richard Lawhorn, responded in opposition. (Doc. 163.) The City replied (Doc. 172), and the motion is now ripe for review. Also before the Court is Plaintiffs' motion for leave to file a proposed sur-reply. (Doc. 175.) Defendant responded in opposition (Doc. 176) and Plaintiffs replied (Doc. 177).

For the reasons set out below, the Court will **GRANT** the City's motion for summary judgment (Doc. 156) and **DENY** Plaintiffs' motion for leave to file a proposed sur-reply (Doc. 175).

## I. BACKGROUND[1]

### A. Factual Background

Plaintiff B&B is a company wholly owned by Plaintiff Richard Lawhorn. (Doc. 40 at 1, ¶¶ 1–2, 10; Doc. 165 at 1–2.)[2] B&B's primary place of business was a bar located in Knoxville, Tennessee. (Doc. 40 at 2, ¶ 10; Doc. 165 at 2.) B&B held a limited-service restaurant Liquor-by-the-Drink license and a beer permit, which together allowed B&B to sell liquor, wine, high-gravity beer, and beer. (Doc. 40 at 2, ¶¶ 11–12.) The liquor license was issued by the Tennessee Alcoholic Beverage Commission ("TABC") while the beer permit was issued by the City of Knoxville Beer Board. (*Id.* at 2, ¶ 12; Doc. 165 at 2.)

For many years during its operations, B&B stayed open well past midnight and was compliant with various City ordinances. (Doc. 40 at 2, ¶ 13.) However, issues began to arise during the Covid-19 pandemic. The Tennessee governor issued an executive order providing that counties with locally run county health departments, including Knox County, "shall have authority to issue additional orders or measures related to the containment or management of the spread of COVID-19, which may permit to a greater degree, or restrict to a greater degree, the opening, closure, or operation of businesses, organizations, or venues in those counties or the gathering of person' [sic]." (*Id.* at 2, ¶ 18.) Between July and September 2020, the Knox County Board of Health ("KCBH")—established under the Knox County Charter—adopted a series of regulations related to the Covid-19 pandemic. (*Id.* at 4–5, ¶¶ 21, 23–24, 29.) The KCBH first required closure

[1] Factual disputes and reasonable inferences regarding the underlying facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2] Citations to Plaintiffs' first amended complaint (Doc. 40) include both the page number and paragraph as certain sections of the amended complaint omit or duplicate paragraph numbers.

of all "bars" in Knox County and suspended permission to offer food and drink for on-premises consumption. (*Id.* at 4, ¶ 23.) The following week, KCBH amended its regulations to allow "bars" to remain open until 10:00 PM, and on September 16, 2020, extended permissible bar hours to 11:00 PM. (*Id.* at 4–5, ¶¶ 24, 29.)

In November 2020, the City's mayor, Indya Kincannon ("Mayor Kincannon"), amended the Code of City Ordinances Chapter 4, Article II, Division 2, Section 4-73(c) to provide, in relevant part, that KCBH regulations "ha[ve] the force of law" and "[f]ailure to comply with the requirements set forth in any such law may cause for a beer permit to be revoked or suspended." (*Id.* at 6–7, ¶ 35.) Mayor Kincannon later amended the Code of City Ordinances Chapter 4, Article II, Division 1, Section 4-32(b) ("Ordinance 4-32(b)" or the "Covid Curfew") to provide that hours for on-premises sale or consumption of alcoholic beverages could be further restricted if limited by lawful order of a regulatory authority, including KCBH. (*Id.* at 7, ¶ 36.) Following these amendments, KCBH adopted a regulation suspending restaurants' and bars' permission to offer on-premises consumption between 10:00 PM and 5:00 AM. (*Id.* at 7, ¶ 37.)

Mr. Lawhorn was a "vociferous opponent of Mayor Kincannon," publicly criticizing her and the City's Covid-19 curfew as unconstitutional. (Doc. 186 at 2–3; Doc. 40 at 9, ¶ 47.) In "fighting for his constitutional rights," Mr. Lawhorn refused to close B&B at 10:00 PM as required by the Covid Curfew. (Doc. 40 at 9, ¶ 47; *id.* at 7, ¶ 37.) In an interview with WBIR Channel 10 News in 2020, Lawhorn announced that he was thinking of running against Mayor Kincannon in the next election because he felt she was "doing a bad job." (*Id.* at 9, ¶ 48; Doc. 165 at 6; Doc. 186 at 3.) By the time of this interview, B&B had already received citations alleging violations of the Covid Curfew, Ordinance 4-32(b). (Doc. 165 at 7.) Mr. Lawhorn also filed litigation

challenging the constitutionality and enforcement of the City's Covid-19 emergency ordinances and related enforcement actions against B&B. (Doc. 186 at 3.)

In total, B&B was cited eighteen times by the Knoxville Police Department ("KPD") for violating the City's Covid Curfew. (Doc. 40 at 9, ¶ 52.) Most of the citations were issued by Sergeant John Coward ("Sergeant Coward"), a member of the KPD. (*Id.* at 2, ¶ 5; *id.* at 10, ¶ 54.) Every citation Sergeant Coward issued to B&B "stated the reason for the violation was being in violation of Knoxville City Ordinance 4-32(b) by being 'open for business past the curfew." [sic] (*Id.* at 10, ¶ 53.) Sergeant Coward communicated with TABC Agent Steven Grooms about the citations and Agent Grooms "executed a summary suspension of B&B's liquor license." (*Id.* at 10, ¶¶ 54, 56.) Eventually, on January 22, 2022, B&B's liquor license was revoked. (Doc. 165 at 5; Doc. 186 at 2.)

Prior to February 10, 2021, B&B still had its beer permit issued by the City of Knoxville Beer Board authorizing B&B to sell beer. (Doc. 165 at 2.) However, on February 9, 2021, a hearing was held "based on the 'Non-Compliance Complaint' brought by the City of Knoxville." (Doc. 40 at 11, ¶ 61.) City Attorney Alyson Dyer handled the prosecution for revoking B&B's beer permit. (*Id.* at 11, ¶ 59.) On February 10, 2021, the beer permit was revoked by a hearing officer appointed by the Knoxville Beer Board. (Doc. 165 at 4; Doc. 40 at 11, ¶¶ 61–65.) On May 7, 2021, a City Court judge affirmed B&B's Covid Curfew citations. (Doc. 40 at 11, ¶ 68.) That same day, the City Communications Department issued a statement from Mayor Kincannon. (Doc. 165 at 4.) In that statement, Mayor Kincannon publicly described B&B as "the single most flagrant violator of the Board of Health pandemic safety measures." (Doc. 186 at 1; Doc. 165 at 4.)

In July 2022, TABC Special Agent Jaymi Prater ("Special Agent Prater") became aware of information suggesting that B&B might be serving alcoholic beverages even though—as she

understood—B&B's liquor license was revoked. (Doc. 156-1 at 35–36.) On July 14, 2022, and July 15, 2022, TABC conducted two undercover operations at B&B where special agents were able to buy alcoholic drinks. (Doc. 165 at 9.) Mr. Lawhorn has acknowledged that liquor was still being served at the time of these undercover operations. (*Id.*; Doc. 156-4 at 32.) After these undercover operations were completed, Special Agent Prater took steps to obtain a search warrant for B&B. (Doc. 165 at 9–10; Doc. 156-1 at 2, ¶¶ 6–7.) Prior to obtaining the search warrant, Special Agent Prater spoke to KPD Officer Steve Taylor ("Officer Taylor"), who had recently observed liquor behind the bar at B&B when he was there on July 12, 2022. (Doc. 165 at 11; Doc. 156-1 at 2, ¶ 7; Doc. 186 at 9.)

At least some City employees were aware of the planned search of B&B prior to the search warrant being executed. City Attorney Alyson Dyer had learned from her counterpart at TABC, TABC Commission Counsel Ryan Mercurio, about the plan to obtain a search warrant. (Doc. 165 at 28; Doc. 156-3 at 2, ¶ 9.) Officer Taylor was also notified by a TABC agent in mid-July about the search warrant for B&B and was invited to go along for the search. (Doc. 165 at 30; Doc. 156-2 at 2, ¶ 5.) In fact, Officer Taylor was provided with a copy of the search warrant and the operations plan in advance of the search. (*Id.*)

On July 19, 2022, Special Agent Prater served the search warrant on the manager of B&B, Jeffrey Gross, and directed a search of the premises. (Doc. 165 at 14; Doc. 156-1 at 3, ¶ 8.) Mr. Lawhorn was not physically present during the execution of the search warrant but acknowledged that there were alcoholic beverages on the premises on July 19, 2022. (Doc. 165 at 13, 19.) Special Agent Prater was assisted in the search by other special agents from TABC. (Doc. 165 at 15; Doc. 156-1 at 3, ¶ 8.) KPD officers, including Officer Taylor, were also present at B&B during at least

part of the operation. (Doc. 156-2 at 2, ¶ 9; Doc. 164-2.) Officer Taylor indicated in his inspection report that he "assisted the [TABC] execute [sic] a search warrant at [B&B]." (Doc. 156-2 at 10.)

TABC agents found alcoholic beverages in various areas of B&B while conducting the search, including bar areas, a storage room, and in a cooler at the bar. (Doc. 165 at 15; Doc. 156-1 at 3, ¶ 8.) There were reportedly several hundred bottles of liquor present at B&B at the time of the operation. (Doc. 156-4 at 23; Doc. 156-1 at 3, ¶ 8.) TABC seized the liquor—claimed to be worth several thousand dollars—as evidence and transported it to a trailer for transport. (Doc. 156-1 at 3, ¶ 8; Doc. 40 at 16, ¶ 95.) Multiple beer kegs were also discovered during the operation. (Doc. 156-1 at 4, ¶ 13.) Officer Taylor investigated alleged violations of the City's beer ordinance, observed beer kegs connected to taps, issued a misdemeanor citation to B&B's manager Jeffrey Gross, and directed that the beer kegs be removed from the premises. (Doc. 186 at 11.) Officer Taylor also issued a separate misdemeanor citation to another individual who was present at B&B for simple possession of schedule II narcotics. (Doc. 156-2 at 3, ¶ 12.)

During the operation, Officer Taylor communicated with other City employees, including City Attorney Dyer, regarding its progress. (Doc. 186 at 11.) During this communication, Officer Taylor advised that he would contact Sergeant Coward, and City Attorney Dyer advised that she would contact TABC Commission Counsel Mercurio. (*Id.*) Following the completion of the July 19, 2022, search, Officer Taylor prepared an investigative report and transmitted it to Sergeant Coward and City Attorney Dyer. (*Id.*)

On July 20, 2022, Special Agent Prater met with Mr. Lawhorn and his attorney at the TABC Knoxville office and issued citations alleging violations of Tennessee liquor laws. (Doc. 165 at 20; Doc. 156-1 at 3, ¶ 10.) No elected official of the City, member of KPD, or other employee of the City was physically present during this meeting at the TABC office. (Doc. 165

at 22; Doc. 156-1 at 3, ¶ 11.) And according to Special Agent Prater, no elected official of the City, member of KPD, or other employee of the City played any part in her decision—as an officer for TABC, which is a state board—to issue citations to Mr. Lawhorn (Doc. 165 at 22–23; Doc. 156-1, at 3, ¶¶ 2, 11.)

Following the search, there was communication amongst City employees discussing the operation. (*See* Doc. 164-7; Doc. 164-4.) On July 21, 2022, Mayor Kincannon received an email which discussed the July 19, 2022, operation to which she responded, "Ok thanks for the info." (Doc. 186 at 6; Doc. 164-7; Doc. 116 at 2, ¶ 7; Doc. 116 at 5.) Then, on July 22, 2022, an article[3] was published describing the raid at B&B. (Doc. 164-5 at 1–2.) The article provided, in relevant part:

> Billiards & Brews had both its state liquor license and city beer permit revoked in early 2021 after repeatedly staying open later than allowed by the city's COVID-19 response regulations.
>
> "Billiards & Brews is by far the single most flagrant violator of the Board of Health's pandemic safety measures," Knoxville Mayor Indya Kincannon said at the time.

(*Id.* at 2.)

While Mr. Lawhorn was not arrested during his July 20, 2022, meeting with TABC for these alleged violations of Tennessee liquor law (Doc. 165 at 21), Mr. Lawhorn was later indicted by a grand jury based on testimony from Special Agent Prater (Doc. 157 at 8). In May 2023, Mr. Lawhorn became a candidate for Mayor of Knoxville in opposition to incumbent Mayor Kincannon. (Doc. 186 at 4.) And at some point, Mr. Lawhorn was "required to surrender pursuant

[3] The parties dispute the City's affiliation with the newspaper that published the article. (*See* Doc. 186 at 6; Doc. 172 at 4.)

to a summons for booking and processing . . . while he was actively campaigning against Mayor Indya Kincannon." (Doc. 164 at 5; 165 at 21.)[4]

### B. Procedural History

This case began on May 23, 2023, when Plaintiffs filed their original complaint against the City, the TABC, and Sergeant Coward, asserting claims related to the City's Covid Curfew. (Doc. 1.) The Court gave Plaintiffs leave to amend their complaint on November 13, 2023. (Doc. 39.) On November 15, 2023, Plaintiffs filed their first amended complaint (Doc. 40), which is the operative pleading in this case. In this first amended complaint, Plaintiffs removed TABC as a defendant and added TABC agent Steven Grooms as a defendant. (Doc. 40 at 1, ¶ 3.) On September 11, 2024, the Court granted Sergeant Coward's motion to dismiss (Doc. 41) and dismissed all claims against him except for one: the § 1983 claim alleging retaliation for exercising First Amendment rights. (Doc. 55.) On October 15, 2024, the Court dismissed the claims against Defendant Grooms without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure for failure to timely serve him with process. (Doc. 58.)

Subsequently, on December 5, 2024, Sergeant Coward filed a motion for summary judgment (Doc. 61) asserting Plaintiffs' First Amendment retaliation claim was barred by the applicable one-year statute of limitations for civil-rights actions filed in Tennessee. (Doc. 62 at 1.) Sergeant Coward contended that Plaintiffs' retaliation claim against him accrued no later than January 28, 2021, and noted that this action was filed on May 23, 2023, more than one year after

---

[4] It is not clear to the Court exactly when Mr. Lawhorn was indicted or required to surrender pursuant to a summons for booking and processing. Plaintiffs state that the indictment was from "October 2022" and that "Mr. Lawhorn was later required to surrender pursuant to a summons for booking and processing on June 28, 2023" at the Knox County Sheriff's Office. (Doc. 165 at 21; Doc. 164-8 at 5, ¶¶ 30–32.) However, Plaintiffs' Exhibit Q (Doc. 164-16), which purports to be the judgment from the Criminal Court of Knox County, Tennessee, lists an arrest date of August 2, 2022, and that the indictment was filed on June 29, 2023.

the retaliation claim accrued. (*Id.*) In response, Plaintiffs stated they did not oppose Sergeant Coward's motion for summary judgment. (Doc. 75 at 1.) On May 7, 2025, the Court granted Sergeant Coward's motion for summary judgment. (Doc. 97.) Consequently, Sergeant Coward is no longer a defendant in this action, leaving the City as the only remaining defendant. On December 6, 2024, the City filed its own motion for summary judgment. (Doc. 64.)

On September 16, 2025, the Court granted in part and denied in part the City's motion for summary judgment. (Doc. 102.) The Court granted the City's motion as to Counts II, III, and IV in the amended complaint. (*Id.*) On Count I,[5] the Court also granted the City's motion as to any allegations of First Amendment violations that occurred prior to May 23, 2022. (Doc. 102.) These claims were dismissed with prejudice. (*Id.*) Nevertheless, the Court noted that Plaintiffs raised two claims stemming from events that occurred after May 23, 2022: (1) the execution of a search warrant at B&B in July 2022; and (2) Lawhorn's "arrest"[6] sometime after May 2023. (Doc. 101 at 6–7.) The Court denied summary judgment for the § 1983 claims of First Amendment retaliation that occurred after May 23, 2022, and allowed the parties to conduct discovery on the substance of those claims. (Doc. 102.)

The denial of the motion for summary judgment for the claims after May 23, 2022, was without prejudice to the right of the City to refile the motion upon the completion of discovery. (Doc. 102 at 2.) The City did so, filing for summary judgment again on June 30, 2026. (Doc.

[5] As the Court has explained previously (*see* Doc. 54 at 14 n.9), Plaintiffs do not specifically reference First Amendment retaliation in Count I of their amended complaint. (Doc. 40.) But the facts they incorporate by reference into Count I previously suggested to the Court that Plaintiffs intended to make this claim. (*See* Doc. 54 at 14 n.9; Doc. 40 at 18, ¶ 102.)

[6] The parties dispute whether there was an arrest warrant at all for Mr. Lawhorn and whether he was arrested. (*See* Doc. 165 at 21–22.) The Court will address this issue in § III.B.

156.) Plaintiffs responded on July 21, 2026. (Doc. 163.) The City replied on July 31, 2026 (Doc. 172) after the Court granted an extension for the City to file their reply brief (Doc. 169). Plaintiffs filed a motion for leave to file a proposed sur-reply. (Doc. 175.) [7]

---

[7] Plaintiffs seek leave to file a proposed sur-reply because Defendant "present[ed] new evidence, including the Declaration of Scott Barker submitted for the first time with the Reply, and raise[d] evidentiary challenges to Plaintiffs' declarations and other summary-judgment evidence that Plaintiffs have not had an opportunity to address." (Doc. 175 at 1.) Defendant responded in opposition (Doc. 176) and Plaintiffs replied (Doc. 177).

"[S]ur-replies are 'highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter.'" *Loomis v. Unum Grp. Corp.*, 539 F. Supp. 3d 898, 905 (E.D. Tenn. 2021) (quoting *Crenshaw v. Portfolio Recovery Assocs., LLC*, 433 F. Supp. 3d 1057, 1063 (W.D. Ky. 2020)). Sur-replies "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).

While the Court finds that the Barker declaration is "new evidence," the Court does not need to allow the proposed sur-reply for two reasons. First, the Court does not rely on the new submission in resolving Defendant's summary judgment motion. *See Seay*, 339 F.3d at 482 (6th Cir. 2003) (finding that a nonmoving party should have an opportunity to respond particularly "when the district court relies on the new evidentiary submissions"). Second, even if the Court did consider the Barker declaration, the proposed sur-reply (Doc. 175-1) does not offer any meaningful response to the declaration beyond asking for a further opportunity to respond. *See Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 549–50 (6th Cir. 2014) (finding party seeking leave to file sur-reply was not denied meaningful opportunity to respond when proposed sur-reply did not offer meaningful analysis on new argument). Plaintiffs' opportunity to respond to the Barker Declaration was in the proposed sur-reply, yet Plaintiffs failed to take advantage of such opportunity in the proposed sur-reply.

As to the "evidentiary challenges" raised in Defendant's reply (Doc. 175 at 1), the Court does not find that these are new arguments that warrant a sur-reply. And the remainder of Plaintiffs' proposed sur-reply (*see* Doc. 175-1 at 3–4, § IV and § V) appears to be an attempt to have the last word on the motion rather than respond to new evidence. *See Davis v. Omnicare, Inc.*, No. 5:18-CV-142-REW, 2019 WL 13100036, at *2 (E.D. Ky. Nov. 4, 2019) ("[P]resentation of some new evidence does not give the [party seeking the sur-reply] *carte blanche* to revisit . . . arguments untethered to such proof.").

The Court will therefore **DENY** Plaintiffs' motion for leave to file the proposed sur-reply (Doc. 175).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). In assessing whether summary judgment is warranted, courts must "draw all reasonable inferences in favor of the nonmoving party." *Hyland v. HomeServices of Am., Inc*., 771 F.3d 310, 316 (6th Cir. 2014). In doing so, the court should consider "the plethora of material available in the record to determine whether the moving party 'is entitled to judgment as a matter of law,'" including "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024) (quoting Fed. R. Civ. P. 56(c)). "Other exhibits may be admitted into evidence and considered if the exhibits are properly authenticated and attached to an affidavit." *Woodruff v. Nat'l Life Ins. Co.,* No. 3:05-CV-330, 2006 WL 2792204, at *1 (E.D. Tenn. July 24, 2006) (quoting *Guzman v. Denny's Inc.,* 40 F.Supp.2d 930, 935 n.3 (S.D. Ohio 1999)). The court should consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).

To survive a motion for summary judgment, "the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-CV-63, 2009 WL 3762961, at *2–3 (E.D. Tenn. Nov. 4, 2009) (explaining that the court must

determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating that no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 248–49. The Court may not make credibility determinations or weigh the evidence in addressing a motion for summary judgment. *Id.* at 255. If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *See id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

"Section 1983 creates a cause of action against any person who, acting under color of state law, abridges 'rights, privileges, or immunities secured by the Constitution and laws.'" *Clayton v. Hogan*, No. 3:22-CV-936, 2023 WL 7930052, at *24 (M.D. Tenn. Nov. 16, 2023) (citing 42 U.S.C. § 1983). "Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001) (citation omitted). To succeed on a claim under § 1983, a plaintiff must "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (citation omitted).

Plaintiffs allege that the City deprived them of their right to not face retaliation for engaging in protected conduct under the First Amendment. Plaintiffs allege that the City took two acts against them, after May 23, 2022,[8] in retaliation for Mr. Lawhorn's protected First Amendment conduct: (1) the July 19, 2022, raid of B&B where several thousands of dollars of liquor bottles were seized by TABC (Doc. 40 at 16, ¶¶ 92–95, 100) and (2) the issuance of a "warrant for [Mr. Lawhorn's] arrest" after he "threw his hat into the Knoxville City Mayoral race" (*id.* at 18, ¶ 110).

The First Amendment "protects against retaliation for 'protected conduct,'" including running for political office and political speech. *See Heard v. Landfair*, No. 23-1277, 2024 WL

[8] The Court previously dismissed "any allegations of First Amendment violations that occurred prior to May 23, 2022," "[b]ased on the parties' agreement and the lack of opposition by Plaintiffs." (Doc. 101 at 9.) In response to the City's first motion for summary judgment, Plaintiffs had previously described two causes of action for First Amendment retaliation that occurred within the statute of limitations: (1) "the independent retaliatory action of illegally raiding plaintiffs' business, seizing thousands of dollars of plaintiffs' private property" and (2) "the independent retaliatory action of arresting plaintiff Lawhorn without probable cause after Lawhorn announced that he was running for the office of Knoxville Mayor against then and current Mayor Kincannon." (Doc. 76 at 3–4.) The Court recognized both acts as the two relevant events occurring after May 23, 2022. (*See* Doc. 101 at 11.)

Plaintiffs' response to the present motion for summary judgment (Doc. 164) references other claimed adverse actions such as the eighteen COVID-19 citations that B&B received (*id.* at 11), which the Court has already found were all issued prior to May 23, 2022 (Doc. 101 at 6). Plaintiffs also reference the separate act that "Mayor Kincannon publicly identified Billiards & Brews as 'by far the single most flagrant violator' of the City's COVID-19 restrictions" (Doc. 164 at 11.) However, Plaintiffs agreed that this quote from Mayor Kincannon was from a statement issued on February 10, 2021. (Doc. 165 at 4.) Plaintiffs further offer that the February 10, 2021, statements were "later republished following the July 19, 2022 enforcement operation," attempting to allege another act of retaliation. (Doc. 164 at 12.) But Plaintiffs did not plead this theory of retaliation in their first amended complaint (Doc. 40), and the Court will not consider it at summary judgment. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788–89 (6th Cir. 2005) (explaining that a plaintiff cannot raise new claim in response to summary judgment).

The Court does not consider Plaintiffs' additional claims of First Amendment retaliation for events that occurred prior to May 23, 2022, to the extent Plaintiffs' response to Defendant's motion for summary judgment raises them.

1252399, at *2 (6th Cir. Jan. 2, 2024); *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (citations omitted). To make out a cognizable claim of First Amendment retaliation, a plaintiff must show:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Kubala*, 984 F.3d at 1139 (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). "[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir. 1998) (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984)).

"[R]etaliation 'rarely can be supported with direct evidence of intent.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)). The Court of Appeals for the Sixth Circuit has "not found that temporal proximity alone can establish retaliatory motive." *Sanders v. Genesee Cnty.*, No. 22-1596, 2023 WL 4543488, at *6 (6th Cir. July 14, 2023) (citation omitted). But "[t]he temporal proximity between the protected conduct and the adverse action can provide circumstantial evidence of retaliatory motive." *Id.* "Conclusory allegations of retaliatory motive 'with no concrete and relevant particulars' fail to raise a genuine issue of fact for trial." *Murray v. Unknown Evert,* 84 F. App'x 553, 556 (6th Cir. 2003) (quoting *Salstrom v. Sumner*, 959 F.2d 241 (Table), 1992 WL 72881, at *1 (9th Cir. 1992)).

Defendant moves for summary judgment on Plaintiffs' First Amendment retaliation claims on two bases. First, Defendant argues that Plaintiffs cannot satisfy all the elements for a First Amendment retaliation claim. (Doc. 157 at 14.) Second, Defendant argues that summary

judgment is proper under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) and *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), arguing that "Plaintiffs have not and cannot produce admissible evidence that Mayor Kincannon was the moving force behind the search of the bar, the seizure of liquor, or the prosecution of Lawhorn." (Doc. 157 at 13–14, 17.) Plaintiffs disagree on the first basis, asserting that summary judgment is improper because there are genuine disputes of material fact for each element of their First Amendment retaliation claim. (Doc. 164 at 2.) Plaintiffs do not squarely, if at all, address Defendant's summary judgment argument based on *Monell* liability.

Despite Plaintiffs' failure to address this second basis, the Court will begin by addressing whether the City can be held liable under *Monell* because Plaintiffs' remaining claims are against a municipality. In *Monell*, the Supreme Court recognized § 1983 liability for municipalities. 436 U.S. 658. However, "[a] municipality cannot be held liable in section 1983 actions on a *respondeat superior* theory." *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell*, 436 U.S. at 691). Rather, to hold a municipality liable under § 1983, a plaintiff must show the violation of a constitutional right by someone acting under color of state law *and* a "municipal 'policy or custom'" that was the "moving force" behind the constitutional violation. *Crabbs v. Scott*, 800 F. App'x 332, 335–36 (6th Cir. 2020) (quoting *Monell*, 436 U.S. at 694); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) ("A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom."). A plaintiff can make a showing of an illegal policy or custom for purposes of establishing municipal liability by demonstrating:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478.

Plaintiffs do not explicitly state under which theory they are pursuing their *Monell* claim against the City for First Amendment retaliation. However, as the Court understands the history of this case, the Court believes Plaintiffs sought to allege a violation based on the second theory of *Monell* liability—that an official with final decision-making authority ratified illegal actions. Plaintiffs' amended complaint states that "[u]pon information and belief, and as a result of Lawhorn exercising his first amendment rights, Mayor Kincannon retaliated and entered into a conspiracy with the other Defendants herein, as well as defendants/conspirators not yet known to shut down B&B." (Doc. 40 at 9, ¶ 49; *see also id.* at 9, ¶ 50; *id.* at 16, ¶ 100.) Plaintiffs' amended complaint also alleges "[i]n May 2023, Mr. Lawhorn, threw his hat into the Knoxville Mayoral race as a candidate and in violation of Mr. Lawhorn's First Amendment Rights," [sic] the Defendants, in concert with other unknown co-conspirators, issued a warrant for his arrest silencing his campaign." (*Id.* at 18, ¶ 110.) Plaintiffs have also acknowledged in prior filings that they are pursuing the second theory under *Monell* against the City. (*See, e.g.*, Doc. 89 at 3–4 (describing the raid of B&B and arrest of Lawhorn as "an act of the Mayor, which is an act of the City and is a policy of the city whether it was written or not and whether it was repeated or not").)[9]

---

[9] After the Court had allowed Plaintiffs to file a first amended complaint (Doc. 40), Plaintiffs later filed a motion for leave to file a second amended complaint. (Doc. 77.) In response to the motion for leave to file a second amended complaint, the City argued that the amendment would be futile because "the defect in this pleading is that there is no allegation that either of these actions [(the search or the arrest)] resulted from a custom or policy of the City." (Doc. 86 at 5.) In reply, Plaintiffs discussed the "ultimate decision maker/final authority" analysis under *Monell* and stated that "[h]erein, the original and amended complaints include factual allegations that Mayor Kincannon acted with retaliatory intent when having the city arrest Lawhorn, and when having the police force raid B&B without probable cause. Docs. 1 and 77. That is an act of the Mayor, which is an act of the City and is a policy of the city whether it was written or not and whether it was repeated or not." (Doc. 89 at 3–4.)

Further, Plaintiffs have not identified any other *Monell* theory they are pursuing in response to Defendant's motion for summary judgment. And "[a]t all events, the burden remains with [Plaintiffs] to demonstrate *Monell* liability." *Rubicon Real Est. Holdings, LLC v. City of Pontiac, Michigan*, 179 F.4th 431, 454 (6th Cir. 2026).

Proceeding on the second theory of *Monell* liability, the City has provided that "for purposes of this summary judgment motion, the City will acknowledge that the Mayor is the final policy maker of the City for purposes of Plaintiffs' claim." (Doc. 157 at 17.) Plaintiffs have not addressed their theory for *Monell* liability in their summary judgment response, nor have they identified who—other than Mayor Kincannon—could be the final policymaker for their First Amendment retaliation claims. Thus, for purposes of resolving Defendant's summary-judgment motion, the Court will presume that Mayor Kincannon is the final policymaker.[10]

In the case where a plaintiff alleges an official with final decision-making authority ratified the illegal act, "on a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to

---

In resolving the motion for leave to amend (Doc. 77), the Court noted in its memorandum that "Plaintiffs alleged both events from which their First Amendment retaliation claims arise, i.e., the July 2020 [sic] search of B&B and the 2023 arrest of Richard Lawhorn, in their First Amended Complaint. The Proposed Complaint could be viewed simply as an attempt to clarify their First Amendment claims before the Court." (Doc. 99 at 6.) The Court then analyzed this second theory of *Monell* liability against the City as to both the search of B&B and the arrest of Mr. Lawhorn. (*Id.* at 11–15.) The Court found that the proposed amended complaint (Doc. 77 at 9–18) did "not allege sufficient facts to show the connection between a policy Mayor Kincannon ratified and the alleged violation of Plaintiffs' constitutional rights." (*Id.* at 15.) The Court denied Plaintiffs' motion to amend the first amended complaint as futile. (*Id.*)

Plaintiffs thus have a heavy burden to raise a genuine issue of material fact now at the summary judgment stage. The factual allegations for Plaintiffs' First Amendment retaliation claim in the first amended complaint, the operative complaint here (Doc. 40), are similar, but less detailed, than those that were put forth in the proposed second amended complaint (*see* Doc. 77 at 9–18).

[10] The Court has previously addressed the mayor's authority as an official with final decision-making authority under the City of Knoxville's charter. (*See* Doc. 99 at 12–13.)

follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'" *Burgess*, 735 F.3d at 479 (quoting *Pembaur*, 475 U.S. at 483). "Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.* (citing *Pembaur*, 475 U.S. at 484–85). Thus, Plaintiffs "must demonstrate that a 'deliberate choice to follow a course of action'" was made by Mayor Kincannon, and this course of action "must be shown to be the moving force behind or cause of the plaintiff[s'] harm." *See id.* at 479.

Here, Plaintiffs fail to raise a genuine dispute of material fact that Mayor Kincannon made a deliberate choice to follow a course of action and that action was the moving force behind any claimed unconstitutional acts. *See id.* Plaintiffs have not presented evidence to show that Mayor Kincannon was the moving force behind the July 19, 2022, raid of B&B, nor have they shown that Mayor Kincannon was the moving force to "arrest" Mr. Lawhorn. The Court will address liability under *Monell* for each claim of retaliation, starting with the July 19, 2022, raid, and then turning to the "arrest" of Mr. Lawhorn.

**A. July 19, 2022, Raid**

Beginning with the July 19, 2022, raid of B&B, Defendant argues that Plaintiffs have not provided any evidence that Mayor Kincannon was the "moving force" behind those events. (Doc. 157 at 11; Doc. 172 at 15.) Plaintiffs do not address the *Monell* argument in their response and instead reiterate the elements of the First Amendment retaliation claim. (*See* Doc. 164.) Here, summary judgment is proper because, even viewing the evidence in the light most favorable to Plaintiffs, they cannot show that Mayor Kincannon was the moving force behind the July 19, 2022, raid of B&B.

To start, Plaintiffs have not presented evidence showing that Mayor Kincannon was aware of the July 19, 2022, raid prior to its execution. Mayor Kincannon explained that during her tenure as mayor, she has "never directed the Inspections Division, or any officer or employee in the Division, to take enforcement action against a particular business." (Doc. 116 at 2, ¶ 5.) She specified that she "did not direct [the July 19, 2022] operation," "did not know that it was occurring, and . . . had nothing to do with it at all." (Doc. 116 at 2, ¶ 7.) In fact, in responding to Defendant's undisputed material facts, Plaintiffs state that "[t]o the extent Defendant contends that Mayor Kincannon was never informed of the operation before July 21, 2022, Plaintiffs are without sufficient information to admit or deny that assertion." (Doc. 165 at 30.) In her deposition, Mayor Kincannon also testified that she did not become aware of the search and seizure of the bar until after it occurred. (Doc. 116 at 2, ¶ 7.) Mayor Kincannon's deposition testimony also directly disputes Plaintiffs' claim that she directed either the City Law Department or the Chief of Police to take action against B&B or Mr. Lawhorn:

> Q. . . . Did you ever direct the City Department – Law Department to investigate or take enforcement action against Billiards & Brews and Richard Lawhorn?
>
> A. No
>
> Q. Did you ever direct the chief of police to take enforcement issues against Mr. Lawhorn or Billiards & Brews, LLC?
>
> A. No

(Doc. 156-5 at 2.)

Other witnesses who were aware of the July 19, 2022, raid prior to its execution have similarly stated in their respective declarations that Mayor Kincannon was not involved in the operation. For example, Officer Taylor, now a Sergeant with the City's police department, stated in his declaration that "an agent from TABC notified [him] that the agency had obtained a search

warrant for [B&B] and invited [him] to go along." (Doc. 156-2 at 1–2, ¶¶ 2, 5.) Officer Taylor further stated that "[p]rior to going on the operation, [h]e received no orders or directions of any kind from Sergeant Coward, the Police Chief, the Mayor, or anyone else related to the operation." (Doc. 156-2 at 2, ¶ 8.) City Attorney Dyer also stated in her declaration that in July 2022, "she learned from [her] counterpart at the [TABC] that agents planned to obtain a search warrant for the bar operated by Billiards & Brews," but that she personally did not "[tell] the Mayor that a search of the bar owned and operated by Billiards & Brews might occur." (Doc. 156-3 at 2–3, ¶ 9.) City Attorney Dyer also explicitly stated that "[she] ha[s] never received any order or direction from Mayor Kincannon to take any action against Richard Lawhorn or Billiards & Brews, LLC." (Doc. 156-3 at 3, ¶ 11.)

In arguing that there was a connection between Plaintiffs' First Amendment activity and the adverse actions, Plaintiffs offer that "Mr. Lawhorn testified that City officials expressly connected the threatened enforcement actions to his opposition to the Mayor." (Doc. 164 at 13.) In his deposition errata, Mr. Lawhorn testified that "John Coward . . . in December of 2020 . . . said that if [he] didn't start following Mayor Kincannon ['s ordinance] 432(b) she would put [him] out of business." (Doc. 156-4 at 43.) Even if the Court considered this statement alleged to have been made by Sergeant Coward,[11] the statement lends little to no support to the conclusion that Mayor Kincannon ordered or otherwise ratified the July 19, 2022, operation, nearly a year and a half after this statement was made. Mr. Lawhorn referenced another statement in his deposition errata that "[i]n June of 2022 another officer who [he did not] know, came in and told [him] that

[11] "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) (citing *Weberg v. Franks,* 229 F.3d 514, 526 n.13 (6th Cir. 2000)).

if [he] didn't quit stepping on the Mayors toes, she was going to put [him] out of business." (Doc. 156-4 at 43.) However, because Plaintiffs cannot identify the source of this information, the Court will not consider this evidence on summary judgment. *See Jackson v. City of Cleveland*, 831 F. Supp. 3d 526 (N.D. Ohio 2026) ("Because the declarant could not identify the source of his information, the Sixth Circuit affirmed the district court's exclusion of this evidence on summary judgment." (citing *Guindon v. Twp. of Dundee*, 488 F. App'x 27, 38 (6th Cir. 2012))). Mr. Lawhorn also provided a declaration which includes why he "believe[s]" the City's actions were undertaken. (Doc. 164-8 at 6–7, ¶ 41.) But "[a]n affiant's 'statement . . . based upon his 'belief' [does] not demonstrate the personal knowledge required by [Rule 56].'" *Ondo v. City of Cleveland*, 795 F.3d 597, 604–05 (6th Cir. 2015) (quoting *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007)).

Plaintiffs also argue that Mayor Kincannon's statement from February 2021 that B&B was "the single most flagrant violator of the Board of Health pandemic safety measures" provides "relevant context for their First Amendment retaliation claims" when viewed with the subsequent enforcement actions against B&B. (Doc. 164 at 3.) But again, as with Plaintiffs' other evidence, this statement does not shed light on how Mayor Kincannon ordered or otherwise ratified the July 19, 2022, operation. Plaintiffs assert another theory related to the February 2021 statement "from which a jury could infer hostility toward Mr. Lawhorn and his business." (*Id.* at 14.) Plaintiffs contend that two days after the July 19, 2022, operation, "City Communications personnel republished" the February 2021 statement by Mayor Kincannon. (*Id.* at 5, 12; Doc. 166 at 4.) The parties dispute whether "City Communications" republished the February 2021 statement (Doc. 172 at 4), but even if it did, Plaintiffs have not explained how the acts of "City Communications" demonstrate that it was Mayor Kincannon who was the moving force behind the July 19, 2022,

operation. Further, Mayor Kincannon's response on a separate email thread regarding the July 19, 2022, raid of "Ok thanks for the info," (Doc. 116 at 5) can hardly be characterized as ratifying the act, let alone rising to the level of creating a genuine dispute of material fact as to whether she was the moving force behind or cause of Plaintiffs' harm. And as the Sixth Circuit Court of Appeals has held, "'single-act' scenarios that point to a policymaker's '*post hoc*' actions following an act of alleged malfeasance are not typically enough to show that the policymaker was the moving force behind a plaintiff's injury." *Guptill v. City of Chattanooga*, 160 F.4th 768, 783 (6th Cir. 2025) ("Such an outcome would effectively make [the City] liable on the basis of *respondeat superior*, which is specifically prohibited by *Monell*." (quoting *Burgess*, 735 F.3d at 479)).

In sum, Plaintiffs have not presented evidence supporting that a "deliberate choice to follow a course of action" was made by Mayor Kincannon, or that the course of action was "the moving force behind or cause of the plaintiff[s'] harm" with respect to the July 19, 2022, raid of B&B. *See Burgess*, 735 F.3d at 479. Plaintiffs have therefore not demonstrated a genuine issue of material fact on this claim.

**B. Arrest**

At the outset, the Court notes that the parties dispute whether there was an arrest warrant at all for Mr. Lawhorn and whether he was arrested. (*See* Doc. 165 at 21–22.) Plaintiffs' amended complaint (Doc. 40) alleged that "[i]n May 2023, Mr. Lawhorn, threw his hat into the Knoxville City Mayoral race as a candidate and in violation of Mr. Lawhorn's First Amendment Rights," [sic] the Defendants, in concert with other unknown co-conspirators, *issued a warrant for his arrest silencing his campaign*." (Doc. 40 at 18, ¶ 110 (emphasis added).) In moving for summary judgment on this claim, the City argues that "[t]he undisputed evidence also shows that Lawhorn was never arrested at all." (Doc. 157 at 12.) Plaintiffs do not address this argument in their

memorandum in support in response to Defendant's motion for summary judgment. (Doc. 164.) However, in responding to Defendant's undisputed material facts, Plaintiffs agree that Mr. Lawhorn was not arrested during his July 20, 2022, meeting with TABC. (Doc. 165 at 21.) Plaintiffs further agree that "Mr. Lawhorn was not aware that an arrest warrant had been issued." (*Id.*) Instead, Plaintiffs submit that "a Knox County Grand Jury returned an indictment in October 2022 . . . [and] Mr. Lawhorn was later required to surrender pursuant to a summons for booking and processing on June 28, 2023." (*Id.*) Plaintiffs further explain that "Mr. Lawhorn was booked, a booking photograph (mugshot) was taken, and the photograph was publicly disseminated by local news media." (*Id.*)

Plaintiffs have not provided the Court with much evidence to support the occurrence of this event. Plaintiffs rely on their allegations in the amended complaint (Doc. 40), Mr. Lawhorn's own deposition testimony (Doc. 156-4), and what appears to be the judgment from Mr. Lawhorn's criminal case (Doc. 164-16). Plaintiffs also attached an exhibit that purports to be the indictment and what the Court assumes is the booking photograph. (Doc. 164-15.)[12] Even if the Court were to consider the judgment from Mr. Lawhorn's criminal case, which has not been authenticated, the judgment only provides that the indictment was filed on June 29, 2023. (Doc. 164-16 at 1.) The judgment does not provide any further evidence that Mr. Lawhorn went through a booking process on June 28, 2023. (*Id.*) Plaintiffs have also not provided the Court with any evidence that the booking photograph was then publicly disseminated by local news media. However, the parties

[12] Exhibit P (Doc. 164-15) is not attached to a declaration and has not otherwise been authenticated. The Court of Appeals has held that generally courts should disregard unauthenticated documents when deciding a motion for summary judgment. *Alexander v. CareSource, Inc.*, 576 F.3d 551, 558 (6th Cir. 2009).

do not dispute that these criminal charges existed, seeing as they agreed that "[o]n April 9, 2024, all criminal charges against [Mr. Lawhorn] were dismissed." (Doc. 186 at 20.)

Even if the Court still considers Mr. Lawhorn being "required to surrender pursuant to a summons for booking and processing" as one of Plaintiffs' First Amendment claims of retaliation, Plaintiffs fail to raise a genuine issue of material fact that Mayor Kincannon was the moving force behind this action. Plaintiffs argue that the timing of the summons for booking and processing was suspect because Mr. Lawhorn was required to "surrender for booking on the indictment," roughly "two months before the August 2023 mayoral primary election." (Doc. 164 at 6.) Even if such timing is suspect, Plaintiffs have not presented any evidence *connecting* the decision to issue a warrant for Mr. Lawhorn's "arrest" to Mayor Kincannon as the policymaker with final decision-making authority. Plaintiffs have not identified to whom Mayor Kincannon would have given this instruction to issue a warrant for Mr. Lawhorn's arrest, nor have Plaintiffs presented any evidence of how Mayor Kincannon ratified the decision by whoever did issue the summons and booking. And as explained in § III.A, Mayor Kincannon denied ever directing the chief of police or the City Law Department to take action against B&B or Mr. Lawhorn. (Doc. 156-5 at 2.)

Similar to the July 19, 2022, raid, Plaintiffs have not presented evidence supporting that a "deliberate choice to follow a course of action" was made by Mayor Kincannon, or that the course of action was "the moving force behind or cause of the plaintiff[s'] harm" with respect to Mr. Lawhorn's "arrest." *See Burgess*, 735 F.3d at 479. Plaintiffs have therefore not demonstrated a genuine issue of material fact on this claim.

It is unnecessary for the Court to address Defendant's first basis for summary judgment—that Plaintiffs cannot satisfy all the elements for a First Amendment retaliation claim—because even if there was an underlying constitutional violation, the City cannot be held liable for § 1983

relief under *Monell*. In sum, the Court grants summary judgment in favor of the City because Plaintiffs failed to raise a genuine issue of material fact that a "municipal 'policy or custom'" was the "moving force" behind the claimed constitutional violation. *Crabbs*, 800 F. App'x at 335–36 (quoting *Monell*, 436 U.S. at 694); *Burgess*, 735 F.3d at 478 ("A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.").

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 156) will be **GRANTED** and Plaintiffs' motion for leave to file a proposed sur-reply (Doc. 175) will be **DENIED**.

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**